IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JAN 13 1999

DAVID J. MALAND, CLERK

BY
DEPUTY _____

| | | |
|---|---|---|
| KERRY MAX COOK, | § | |
| Petitioner | § | |
| | § | |
| vs. | § | Civil No. 6:99cv15 |
| | § | |
| ROBERT JONES, JUDGE, | § | |
| 241st JUDICIAL DISTRICT | § | |
| COURT, J. B. SMITH, SHERIFF | § | |
| OF SMITH COUNTY, AND THE | § | |
| STATE OF TEXAS, | § | |
| Respondents. | § | |

## PETITION FOR WRIT OF HABEAS CORPUS

Steven R. Rosen
The Lyric Centre
440 Louisiana, Suite 2100
Houston, Texas 77002
Phone: (713) 227-2900
Facsimile: (713) 227-2922
State Bar No. 17266200


Cheryl B. Wattley
Wattley & Plumlee, LLP
4311 Oak Lawn Avenue
Suite 555, LB 23
Dallas, Texas 75219-2310
Phone: (214) 443-9300
Facsimile: (214) 443-0600
State Bar No.: 20978100

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

DISCUSSION
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   I.  TWENTY-ONE  YEARS LATER, PROSECUTORIAL MISCONDUCT,
      THE  DEATH OF A WITNESS AND RESTRICTIVE EVIDENTIARY
      RULINGS  DENY PETITIONER A FAIR TRIAL
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      A.  Prosecutorial Misconduct  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    PROSECUTION INTRODUCED MISLEADING EXPERT OPINION
      TESTIMONY  ABOUT THE PURPORTED
      AGE OF THE FINGERPRINTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    TRIAL PROSECUTOR APPROACHED AND SPOKE WITH
      PETITIONER WITHOUT THE PRESENCE OR
      KNOWLEDGE OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     PROSECUTION FAILED TO DISCLOSE INFORMATION REGARDING
      LOUELLA MAYFIELD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    PROSECUTION FAILED TO DISCLOSE EVIDENCE THAT
      PETITIONER  AND DECEASED KNEW EACH OTHER . . . . . . . . . . . 22

    DURING THE FIRST TRIAL, PROSECUTION MISREPRESENTED
      THAT THERE WAS NO DEAL WITH ARRESTEE FOR
      TESTIMONY AS TO A PURPORTED
      JAILHOUSE CONFESSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   THE PASSAGE OF TIME IN CONJUNCTION WITH THE
      PROSECUTORIAL MISCONDUCT RENDERS A
      FOURTH TRIAL FUNDAMENTALLY UNFAIR  . . . . . . . . . . . . . . . . . 25

     Impact on Witness Appearances  . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     Impairment of Cross-Examination . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     Impediment on Petitioner's Right to Testify . . . . . . . . . . . . . . . . . . . . 29

State's Ability to Bolster Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

II.  LEGAL PRINCIPLES WARRANTING THIS COURT'S
        INTERVENTION IN THIS PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| KERRY MAX COOK,<br>Petitioner | § <br> § <br> § | |
| vs. | § <br> § | Civil No. _6:99 cv 15_ |
| ROBERT JONES, JUDGE,<br>241st JUDICIAL DISTRICT<br>COURT, J. B. SMITH, SHERIFF<br>OF SMITH COUNTY, AND THE<br>STATE OF TEXAS,<br>Respondents. | § <br> § <br> § <br> § <br> § <br> § | |

## PETITION FOR WRIT OF HABEAS CORPUS

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Petitioner, Kerry Max Cook, by and through his attorneys of record, Stephen R. Rosen and Cheryl B. Wattley, and pursuant to 28 U.S.C. §§ 2241 and 2254, and the Fifth and Fourteenth Amendments of the Constitution of the United States, presents this his Petition For Writ of Habeas Corpus, and as grounds therefore, would respectfully show this Honorable Court the following:

### INTRODUCTION

> **"Prosecutorial and police misconduct has tainted this entire matter from the outset. Little confidence can be placed in the outcome of appellant's first two trials as a result, and the taint, it seems clear, persisted until the revelation of the State's misconduct in 1992."[1]**

---

[1]

The opinion is reported at 940 S.W.2d 623 (Tex.Cr. App. 1996) *rhng' denied*. (A copy of the opinion is attached as Exhibit 1) The Court is respectfully referred to that opinion for a recitation of the facts related to the charged offense.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 4

These words from the Texas Court of Criminal Appeals poignantly capture the essence of the prosecution of Kerry Max Cook.

From the first trial conducted in 1978 and through retrials in 1992 and 1994, Cook has been repeatedly subjected to prosecutorial misconduct.[2]   However, it is the State's urging in May 1988 that an execution date be set that best dramatizes the arrogant wrongdoing and callous misconduct of the Smith County District Attorney's office.  Fully aware that a critical state witness had recanted his testimony regarding a bogus jail house confession, there was nonetheless a concerted push for a date on which Cook would be strapped to the execution table.

Additionally, in 1991, at the time that the State was submitting a Petition for a Writ of Certiorari seeking to undo the Court of Criminal Appeals' reversal, the District Attorney's Office had in its possession a confidential memorandum from one of its key witnesses, its fingerprint expert, that he had given critical testimony about the age of fingerprints that was not scientifically supported.[3]  Yet, even that remarkable information did not deter the Smith

---

Ironically, the Court of Criminal Appeals' reference to the 1992 disclosure and the attending footnote have been quoted to suggest an exoneration of the District Attorney's office after A.D. Clark left office. However, the opinion does not address the fact that the subsequent administration maintained exculpatory information in its files during the appellate proceedings, including petitions before the United States Supreme Court and the setting of an execution date.  Further, the Assistant District Attorney who attempted to interview Petitioner without the presence or knowledge of his attorneys is one of the current trial prosecutors. He approached Petitioner in 1992, well after the misconduct of the A.D. Clark III administration.

[2]  The docket sheet reflecting the  chronology of this interminable prosecution is set forth as Exhibit 2.

[3]The Honorable Joe Tunnell found, after a full evidentiary hearing:
 1) The testimony given by Collard [the fingerprint expert] as to the age of the prints is calculated to mislead, and likely did mislead, the court and the jury;
2) The testimony was especially critical because it placed the applicant inside the apartment within the time the evidence showed the victim died.
Findings of Fact and Conclusions of Law, Judge Tunnell, attached hereto as Exhibit 3.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 5

County District Attorney's office from seeking to have the conviction based upon the fraudulent fingerprint testimony and the induced jail house confession upheld.[4]

Petitioner  has now been scheduled for a fourth trial to commence on February 8, 1999.  Because of the repeated violation of his federal constitutional rights and the failure of the state courts to accord the necessary protections of those rights, Petitioner seeks the extraordinary intervention of this court in this most unusual prosecution.

In its reversal, the Court of Criminal Appeals described this case as one of "first impression".  The question now before this Court, likewise one of first impression, is whether the combination of prosecutorial misconduct, the passage of almost twenty one years, the death of a key witness, and restrictive evidentiary rulings can so degrade the normal workings of justice that a fair trial becomes impossible and thus retrial is forbidden under due process, double jeopardy and due course of law principles.

## STATEMENT OF JURISDICTION

Petitioner's first trial in Smith County Cause No. 1-77-179,  ended in a conviction and death sentence in June, 1978.  That conviction was affirmed by the Texas Court of Criminal Appeals in 1987.  *Cook v. State,* 741 S.W.2d 928 (Tex. Crim. App. 1987).  The United States Supreme Court vacated that judgment and remanded the case for further proceedings. *Cook v. Texas,* 48 U.S. 807, 109 S.Ct. 39 (1988).  Thereafter, the Texas Court of Criminal Appeals reversed the judgment and remanded the cause to the trial court. *Cook v. State,* 821. S.W.2d 600 (Tex. Crim. App. 1991) A retrial conducted in 1992

---

[4]

Not surprisingly, as it pursued its Petition for Writ of Certiorari, the State did not make any effort to supplement the record or otherwise bring these developments to the attention of any Court.

ended in a mistrial after the jury was unable to reach a verdict. A third trial was conducted in 1994 which resulted in a conviction and a sentence of death. In November, 1996, the Texas Court of Criminal Appeals reversed Petitioner's conviction and held that Smith County District Attorney's office had suppressed material, exculpatory evidence. In November, 1997, Petitioner was released on bond awaiting trial. The State is now seeking to retry Petitioner in violation of double jeopardy and due process a remarkable fourth time with trial scheduled to commence on February 8, 1999.

Petitioner has filed a Special Plea in Bar seeking an order barring the State from proceeding with a fourth trial and an order of dismissal on the basis of violations of principles of double jeopardy and due process. That Motion has been denied.

DISCUSSION

### I.  TWENTY-ONE  YEARS LATER, PROSECUTORIAL MISCONDUCT, THE  DEATH OF A WITNESS AND RESTRICTIVE EVIDENTIARY RULINGS DENY PETITIONER A FAIR TRIAL

A. Prosecutorial Misconduct

The opinion of the Court of Criminal Appeals illustrates some of the difficulties presented by the past misconduct. When such negative consequences are considered in conjunction with evidentiary rulings that have governed the conduct of Petitioner's second and third trials, it is clear that the remedial measures anticipated by the Court of Criminal Appeals will be denied Petitioner and that he will be due a fair trial and due course of law.

To fully appreciate the magnitude of the impact of the cumulative prosecutorial misconduct and the harm that Petitioner continues to suffer, the more significant instances

of misconduct are discussed in turn.

> PROSECUTION INTRODUCED MISLEADING EXPERT OPINION
> TESTIMONY ABOUT THE PURPORTED
> AGE OF THE FINGERPRINTS

Smith County District Attorney's office knowingly and repeatedly solicited the misleading testimony of its fingerprint expert that the fingerprints found on the patio door were 6-12 hours old. "The prosecutor's insistence that Collard [the fingerprint expert] give the testimony and the prosecutors' failure to bring out the fact in court, as requested by Collard, that there was no scientific basis to support Collard's expressed opinion as to the age of the prints consituted prosecutorial misconduct by the prosecutors."[3]   The obvious purpose of that false and fraudulent  testimony was to place Petitioner in the victim's apartment during the very time period of the murder, critical testimony which has proven to be a key point in the State's prosecution of Petitioner.[4]

Even at the inception of this tortured prosecution, the State emphasized this false testimony.  Collard's opinion that the fingerprints were "eight to twelve hours old at the time

---

[3]Findings of Fact and Conclusions of Law Made in the Above Styled Wirt of Habeas Corpus Hearing, January 29, 1993, Honorable Joe Tunnell, 241st Judicial District Court, Smith County, Texas, attached hereto as Exhibit 3.

[4]The import of Collard's false testimony is best illustrated by an exchange with a grand juror.
   Grand Juror: Well, you don't think he'd been in that apartment two or three days earlier, and left that print?
   Sergeant Collard: No, sir, not as fresh as these prints were.  Not on an aluminum surface. From the experience that I've had on other burglaries, etcetcera [sic] on aluminum surfaces, no, sir.  Because they don't usually last that long.  In a day or two days they'll start deteriorating rapidly after that.
Collard Grand Jury testimony, p. 18, attached hereto as Exhibit 4.

he lifted them ... at nine a.m. on June the 10th, 1977" was quoted by the affiant in the affidavit underlying the complaint which launched this prosecution.[5]

At the examining trial held on August 19, 1977, Collard testified that he estimated the fingerprints to be approximately between six to twelve hours old.[6]   That testimony was fully exploited by District Attorney A.D. Clark in his argument.   After noting that the pathologist had stated that the time of death was between 11:30 P.M. and 1:30 A.M. on June 9, 1977 and June 10, 1977, Clark stated: "*And that the prints placed there by Kerry Mac [sic] Cook , which required him to be in the apartment in order to place them, **were six to twelve hours old** at nine A.M. on June the 10th, 1977.   Which means they had been placed there between nine o'clock at night the [preceding] night, and twelve noon—or twelve midnight.*"   This fraudulent testimony became one of the cornerstones of the State's pursuit of Petitioner.

Collard repeated that testimony before the grand jury which clearly impacted the grand jury's assessment of the propriety of the proposed charges against Petitioner. Having discussed his opinion that the fingerprints were six to twelve hours old, a grand juror specifically inquired as to whether it was possible that the fingerprints had been made two to three days earlier.   That most pertinent question was answered by Collard with a re-affirmation that the fingerprints were "fresh", a term that reinforced the "hours old"

---

[5]Transcript of Hearing on Writ of Habeas Corpus, October 19, 1992, pp. 59-60 attached hereto as Exhibit 5.

[6]Transcript of  Examining Trial held on August 19, 1997, pps. 69-70, 78, 85-86 attached hereto as Exhibit 6.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 9

characterization.[7]

On September 20, 1977, Collard told a judge, conducting a hearing on a habeas corpus petition, that, in his opinion, that prints "were approximately six to twelve hours old". With this fraudulent testimony, Collard actively misled the judge and crippled the judge's ability to render a fair assessment and ruling.

This testimony was reasserted in the 1978 trial and again provided the critical linkage between Petitioner and the victim's apartment at the time of the murder.

By the time of the second trial in 1992, the fraudulent nature of Collard's testimony had been identified. Called upon to explain the District Attorney's Office's use of such perjured testimony, the former District Attorney, A.D. Clark testified that, despite eliciting the requisite testimony and qualifications to qualify Collard as an expert, Collard's testimony relative to the age of the fingerprints was a "personal" opinion. However, when he proved Collard up as witness, he "[didn't] know what intent—our intent was for Mr. Collard to testify about every opinion he had and it was our intent that the defense test those opinions to determine what his bases were; defense chose not to".[8]

The role of the District Attorney's office in soliciting this testimony cannot be ignored. According to Collard's statement to the International Association for Identification, a fingerprint licensing board,  he repeatedly requested that he not be asked as to his opinion of the age of the prints, a request that was rejected by the District Attorney.

...While processing and upon discovery of the latent I made a

---

[7]Transcript of Grand Jury, attached hereto as Exhibit 4

[8] Transcript of hearing on Writ of Habeas Corpus, pp. 73-75, attached hereto as Exhibit 5

PETITION FOR WRIT OF HABEAS CORPUS,
Page 10

general statement (*I thought only to myself and my other I.D. Officer.*) It was something to the effect that the latent has got to be the suspects and that from appearance that I felt it was it [sic] could possible be 6 to 12 hours old.  This statement was overhead by one of the criminal investigators and later relayed to the Smith County District Attorney, A.d. Clark, III.

The bond hearing in this case cam unexpectedly.  I was given only a short period of time to appear.  I was contacted by the District Attorney who asked me if I had made the statement regarding the approximate age of the latent print.  I informed him that I had made the statement, but that it was not intended for use and that there was no positive or scientific way that it could be supported.  He advised that if I had made the statement, it was therefore an opinion.  He also advised that I would possible be asked if I had formed an opinion as to the age of the latent print.  I informed him that when I made the statement, I believed it to be true, but that I still could not support it if challenged.  It was only a statement/opinion (normally not made), that no proof or testing exists, it cannot be supported, and that I feel it should not be used.   I was told that I will be asked if I had formed an opinion while at the scene.  I then requested the District Attorney if he insisted, to follow up with the fact that is was only my opinion and that of no one else.  While testifying in this hearing I was asked if I had formed an opinion as to how long the prints had been present on the door frame.  I stated that I did form an opinion, and when asked for the opinion stated that it was six to twelve hours old.  No other questions or emphasis was placed on the time frame and no challenge or other questions to this issue was raised by the defense attorney.

At this hearing I believed (this has been confirmed with a local District Judge) that I had no other choice but to testify as I did during this hearing.  This then opened the time category for future trials in this matter.

.   .   .   .   .   .

Prior to each of my appearances, I requested this portion of the evidence not be used and each time it was still used.

.   .   .   .   .   .

The facts of this case were covered in three separate court actions and I was the principal witness in each of these actions. This case is 12 years old, and full details are often hard to recall.  Even more so when you cannot obtain all the evidence for review.   I testified to the facts that I understood, developed, obtained through testing or through experience.  I made a statement and gave an opinion.  As I have stated it was an opinion, only my opinion.  I knew

PETITION FOR WRIT OF HABEAS CORPUS,
Page 11

when this first came up (first hearing) that it was a mistake on my part to have openly made the statement. I did not make the statement with the intent it was to be used. I attempted to prevent this from going any further but met with full and continued resistance. I did so each time had the chance and before anytime I testified. I could not under oath deny I made this statement, but only defend it to by [sic] best ability. If this case should returned to any court for further hearing and I am called to again testify, I will still testify the same. I will guarantee (as I have done each time) that I will still request that I not testify this was, and will still insist that if I have to testify to this issue that it be included that (1) it is my opinion (2) only my opinion, (3) no other examiner will confirm this opinion, (4) that this opinion does not represent the International Association for Identification or any of its members. [9]

In reviewing the issue of Collard's false testimony, the Court of Criminal Appeals wrote:

However, the witness, Sgt. Collard, admitted, in writing and in response to a grievance filed against him in 1978, his "expert opinion" regarding the age of the fingerprints was not in fact an expert opinion, was a mistake which could not be supported by any scientific evidence or by any other latent fingerprint expert, and that the district attorney had pressured Collard to present the false and misleading evidence against Collard's wishes. Collard's written statement was not disclosed to appellant until 1992. . . .

The State's misconduct with respect to Collard's testimony was corrected by full disclosure prior to appellant's third trial.

Yet, the question must be posed as to how that disclosure "corrects" the misconduct. The very indictment which is the basis of this prosecution was returned by a grand jury that was deliberately misled as to the age of the fingerprints. And the grand jury was misled in that specific fashion so that it would believe that Petitioner had been in the victim's apartment at the time of her death.

---

[9]

Collard's Response to International Association for Identification, May 22, 1989, attached hereto as Exhibit 7.

> A.D. Clark (District Attorney: I want to stress, Sergeant Collard made his, he can correct me if I'm wrong, he made his opinion on how old the print was before it was known when the girl was killed. And, of course, that matches up. Later on, you'll see in the autopsy report, the doctor put her death in the period of time that, in Sergeant Collard's opinion, the prints were put there. These are all independent determinations.[10]

It is clear that the fraudulent testimony was used to manipulate the grand jury into returning the indictment. The District Attorney's statement was wrong and went uncorrected by Collard. In his IAI response, Collard listed as the third factor influencing his opinion as to the age of the prints was "knowing the approximate time the crime occurred". As long as the indictment which was obtained through fraud and deceit is the basis of any prosecution, Petitioner continues to be irreparably and unlawfully harmed by this prosecutorial misconduct.

Moreover, "correcting" the misconduct through the disclosure can only occur if Petitioner is allowed to use that testimony to cross-examine Collard. The mere prohibition that Collard cannot assert a specific number of hours with respect to the age of the fingerprints is not an adequate remedy.[11] He has been permitted to offer his opinion that the prints were "fresh". The State has also introduced the testimony of a fingerprint analyst from the Internal Revenue Service, Criminal Investigation Division, to bolster Collard's testimony by suggesting that the individual actually taking the fingerprints at the crime scene "can determine the relative freshness of a latent fingerprint". However, even he had

---

[10]

Collard 1977 Grand Jury testimony, p. 18, attached hereto as Exhibit 4.

[11]

In the 1994 trial, the Court specifically allowed Collard to offer a modified version of the misleading testimony by permitting him to characterize the fingerprints as "fresh".

PETITION FOR WRIT OF HABEAS CORPUS,
Page 13

to ultimately acknowledge that with respect to the "freshness" of the prints he "could not determine whether or not somebody makes a correct call as to whether a fingerprint is fresh" and that with respect to the freshness of the subject fingerprints there was only "the opinion of Mr. Collard".[12]

Defense counsel have been restricted in the scope of their cross-examination. The fact remains that Collard was willing to provide what has been characterized as false and misleading testimony. He gave an "expert opinion" that had no scientific basis. He yielded to the influence of the District Attorney's office in continuing to offer such testimony. However, based upon the Court rulings governing the subsequent trials, Petitioner's counsel are not permitted to inquire as to Collard's prior testimony. They are not allowed to probe his willingness to offer an opinion lacking scientific support. They are not allowed to attack his prior testimony before the grand jury that prints were 6 - 12 hours old.[13] Defense counsel are not allowed to point out that Collard repeated the deceptive testimony and the charade of an expert witness giving a "personal" opinion at a 1992 habeas corpus hearing.   Petitioner is not allowed to explore this demonstrated bias and interest of Collard.[14]

Petitioner has been precluded from questioning Collard about the administrative

---

[12]

Testimony of William Watling, 1994 trial, pps. 530, 545-546 attached hereto as Exhibit 8.

[13]

Trial Transcript, 1994, pps. 428-430, attached hereto as Exhibit 9.

[14]

Collard was also subjected to an administrative inquiry by the International Association for Identification because of his misleading, not supportable opinion that the fingerprints were 6 - 12 hours old. See Collard Response to IAI complaint attached as Exhibit 7.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 14

investigation of his testimony aging the prints and the statements that he made to the International Association for Identification, which statements reflect his bias and hostility.

> ...I personally resent the fact that one individual referring to the investigative reporter) can create such a power with his statements that it can continually create problems for an individual from now on.[15]

These restrictions on Collard's testimony are important because he is the State's primary witness as to the crime scene and the collection of evidence. However, the **only** physical evidence uncovered that links Petitioner to the scene of the crime are the fingerprints. Thus, Collard's willingness to overreach in an effort to connect Petitioner to the scene is highly relevant and probative but unavailable to Petitioner.

Consequently, the prosecution which was born out of false and fraudulent testimony placing Petitioner at the scene of the crime at the estimated time of death, continues to live and Petitioner is not even allowed to attack the credibility of the State's witness who created this most horrendous charade. Moreover, the District Attorney's office corruptly manipulated what it knew to be a personal opinion that had been  influenced by the pathologist's estimate of time of death.

Not only has the District Attorney's office not been sanctioned for repeatedly presenting evidence that it knew to be misleading,  the State is now  allowed to argue through innuendo and equivocation that the prints were recent.  The State's actions from the inception with respect to the aging of fingerprint testimony clearly poisoned the

---

[15]

Collard Response to International Association for Identification, p. 11,  Exhibit 7.

proceedings against Petitioner.[16]   And now, the Petitioner has been stripped of the most meaningful avenue to attack Collard's opinion and credibility.

> ## TRIAL PROSECUTOR APPROACHED AND SPOKE WITH PETITIONER WITHOUT THE PRESENCE OR KNOWLEDGE OF COUNSEL

It is uncontroverted that in March, 1992 when Petitioner was being processed into the Smith County jail, David Dobbs, the lead trial attorney in this case, on his own volition and without notice to defense counsel, went to the Smith County Jail for the purpose of seeing Petitioner.[14] Even though Dobbs determined almost immediately that Petitioner's counsel was not present, Dobbs continued in his interaction with Petitioner.

Such contact directly impacts Petitioner's ability to testify.  The prosecutor has, through his illegal conduct, developed some sense, no matter how minimal,  of the

---

[16]

District Attorney Skeen argued at the 1992 trial that: "The experts can argue about fresh, but the latent examiner that lifted the print, Doug Collard, said they were fresh.  Bill Watling said, a latent examiner at the scene can determine if prints are fresh."  1992 Trial Transcript, p. 106 attached hereto as Exhibit 10.

A similar argument was made by Mr. Skeen in the 1994 trial. "Doug Collard said, when I lifted those prints, they were fresh, they jumped out at me.  Bill Watling, the IRS fingerprint man said, 'I believe, in my opinion, that the latent, the man who is lifting the prints at the scene, the man who is lifting the prints at the scene is in a position to give an opinion as to whether or not the print is fresh, whether or not the print jumps out at him".  1994 Trial Transcript, pp. 2791-2792 attached hereto as Exhibit 11.

[14]

Dobbs testified that he thought Petitioner's counsel might be present upon Petitioner's arrival at the county jail.  The record, however, does not reflect any basis for that assumption.  Given that the Texas Department of Corrections does not routinely provide notice of its transportation of prisoners the basis for any such expectation is suspect.

Similarly, Dobbs testified that he said "you've been on death row for quite some time.  And I asked him if he would be more comfortable staying down on death row, if he had any apprehension about being back up here at Smith County...I believe we were in the process of attempting to file a motion to send him back to death row to get him out of Smith County because we didn't want the security nightmare had and I understood from the case that he would be apprehensive about being in the Smith County Jail." By Dobbs' own testimony, he was actively soliciting information from Petitioner.

Testimony of David Dobbs, Hearing on Habeas Application, attached hereto as Exhibit 12.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 16

Petitioner.  He has directly and closely observed him under a stressful situation.  He has experienced Petitioner's  reaction to questions and confrontation.  He has some direct exposure to Petitioner's ability to articulate and communicate.  Further, the information and comments by Petitioner can impact and assist the prosecutor in formulating areas of examination and the approach to various avenues of questionning.

Dobbs' comments regarding the Petitioner are particularly illustrative of this point.

> I can understand where someone in that situation would be paranoid and the one regret I have about this is that I have full privy to all of his psychological records from the Rusk State Hospital and also from the Texas Department of Corrections while he's been incarcerated and I know what type of paranoid behavior he's engaged in in the past, including self-mutilation.  And I should have — it's an error in judgment, I should have recognized...

Drawing from these comments, the prosecutor now has confirmed in his mind that the Petitioner is "paranoid" which perception can either be exploited or manipulated during cross-examination   of   Petitioner   should   he   elect   to   testify.

But Dobbs' conduct is significant in other respects as well.  According to Dobbs, he told Petitioner, in response to Petitioner's query as to whether they had "broke" Jim Mayfield yet, that:

> *No, [we] haven't broken James Mayfield but we're still investigating the case and It's my understanding that James Mayfield is going to come and take a polygraph and I've talked to some people in Dallas about setting up a polygraph but it's very comprehensive, involves blood tests and that kind of thing.*

Dobbs' true motives in approaching Petitioner at the Smith County Jail can only be

inferred from his admissions and actions.[15]   What purpose did Dobbs have in telling

Petitioner that Mayfield was going to take a polygraph examination, a very sophisticated

one involving blood tests.[16] That he was trying to either "trick" or manipulate Petitioner into

some incriminating or damaging remarks is revealed by the fact that there are no such

polygraphs. [17]   If he did not have some ulterior purpose, Dobbs would not have any

reason to describe a polygraph that simply does not exist.[18]

But, as a consequence of Dobbs' decision to approach Petitioner at the Smith

County Jail, he made certain admissions against interest which Petitioner should be

allowed to introduce at trial.  For example, Dobbs admitted that in March 1992, there was

a "circus-like atmosphere" which surrounded the Petitioner's case and the reversal by the

Court.  That "circus-like atmosphere" was so intense that it motivated an experienced

prosecutor to violate one of the most elementary and basic tenets of the practice of law,

namely that an attorney does not have contact with an individual represented by counsel

------

[15]

There is yet another troubling incident involving Prosecutor Dobbs. During the 1992 retrial, counsel for Petitioner observed Dobbs reading from pages of a transcript of a witness, which pages were previously mysteriously missing.

[16]

Interestingly, when Mayfield was interviewed on June 10, 1977 by the police, he was requested to take a polygraph and one was scheduled for the following Monday afternoon.  That Monday morning, Mayfield approached a colleague, Dr. Frederick "Gary" Mears, a forensic psychologist on the faculty at then Texas Eastern University. Mayfield advised Mears that he had been asked to submit to a polygraph and that he needed his help with respect to that polygraph.  Petitioner has not been allowed to present this testimony to the jury. 1992 Trial Transcript, pp. 87-104 attached hereto as Exhibit 14.

[17]

See Affidavit of William R. Teigen, attached hereto as Exhibit 15.

[18]

In much the same manner, Dobbs' admission to an investigator working with Petitioner's defense team that he did not believe that Paula Rudolph had really seen Petitioner in the apartment the night of June 9 - 10, 1977 is thwarted as long as he is allowed to represent the State.  See Affidavit of James McCloskey attached hereto as Exhibit 16.

knew that   "You've done nothing but assert your innocence the whole time."   This statement is particularly significant for it is in response to Defendant's accusation that other representatives of Smith County had falsely claimed that he had confessed to them. Mr. Dobbs' statement is an admission that Defendant has never confessed to any Smith County representatives.[21]

This admission by Mr. Dobbs is crucial because on various occasions the prosecution has claimed that Defendant made admissions tantamount to a confession. Defendant has consistently challenged those statements and Mr. Dobbs' recognition that Defendant has "done nothing but assert [his] innocence the whole time" directly challenges the supposed confessions.

However, because Dobbs is the assigned Assistant District Attorney prosecuting this case, Petitioner does not have available to him that testimony to establish in a precise, convincing manner the existence of the "circus-like testimony" and its impact on individuals.[22]   Once again, the State engages in prosecutorial misconduct and suffers no consequences for the wrongdoing.  The Petitioner, however, is subject to being returned to death row and face an execution date.[23]

---

[21]

This admission is particularly significant because it is made at a time when Robert Wickham is disclosing for the first time to law enforcement officials that Defendant purportedly confessed during an elevator ride.

[22]Petitioner has filed a Motion to Disqualify Smith County District Attorney's Office which seeks, as alternative relief, the disqualification of David Dobbs.  The Court has not yet ruled upon this motion.

[23]

This was not the first time that Petitioner had been unlawfully approached by State officials. At the conclusion of the Examining Trial held on August 19, 1977, Petitioner's counsel made it clear that Petitioner was exercising his right to remain silent and sought an order directing that all attempts at interrogation should stop.  The Court orally granted that motion. Petitioner's counsel filed a Motion to Show Cause because

without that counsel's knowledge and permission. If the "circus-like atmosphere" could so influence the conduct of an otherwise cautious prosecutor, its impact upon witnesses is even greater.[19]

More importantly, however, this statement is an admission that James Mayfield, even as late as March 1992, was still identified as a potential suspect.[20] Throughout the closing arguments, Mr. Dobbs actively derided Defendant for even suggesting that Mayfield was a viable suspect.

> "If you take a real close look at the evidence you can see that Jim Mayfield cared for Linda Jo Edwards. Jim Mayfield would not have been capable of doing this to a woman that he had been intimate with for months.
> Look at this. Is this something that someone who is having an affair with someone, someone who loves that person is going to do?

An admission by the active prosecutor that investigative tools are still being used with respect to Mr. Mayfield legitimates Defendant's position that Mr. Mayfield is a valid suspect. Only Mr. Dobbs' testimony can establish this point with such clarity and legitimacy.

Mr. Dobbs is also a witness because of another aspect of his conversation with Defendant. At the habeas proceeding, Mr. Dobbs testified that he told Defendant that he

---

[19]

See discussion *infra* at pps. 30-33 regarding the changes in witness testimony that occurs after the reversal of Petitioner's case in 1991.

[20]

The Smith County District Attorney's office's continued investigation of James Mayfield is also an appropriate area of inquiry on cross-examination for other witnesses. The friendship between James Mayfield and Paula Rudolph is a subject that bears directly upon her bias and motive. The continued published reports that the District Attorney's office was again investigating James Mayfield is probative of Ms. Rudolph's testimony. Such areas of cross-examination are the core of the Defendant's Sixth Amendment right to confrontation. *See e.g. Delaware v. Van Arsdall,* 475 U.S. 673, 678-79, 106 S.Ct. 1431, 1434-35 (1986)

## PROSECUTION FAILED TO DISCLOSE INFORMATION REGARDING LOUELLA MAYFIELD

The prosecution failed to disclose significant information regarding the actions of Louella Mayfield, the then sixteen year old daughter of the victim's married paramour. Specifically, the Smith County District Attorney's Office failed to disclose:

- that Louella Mayfield made death threats against Linda Jo Edwards in the weeks preceding the murder

- that Louella Mayfield falsely identified herself as a police officer

- that Louella Mayfield told the apartment manager at the Embarcardero apartments that she was investigating a murder involving Linda Jo Edwards and Jim Mayfield two weeks prior to the murder

- that Louella Mayfield visited at least one other apartment complex under the guise of investigating a murder

For fourteen and one-half years that information was kept hidden from the defense. The Court of Criminal Appeals recognized that the "passage of time" has "complicated appellant's opportunity to investigate and develop a potential defense based on her as a viable suspect. However, the record reflects that the difficulties confronting Petitioner are not merely complicated but made insurmountable.

There is no effective investigation that can be conducted. There is no meaningful pursuit of potential witnesses or development of evidence that can occur. The excessive

_____

efforts to interrogate him had continued. That motion was dismissed, however, on the State's motion that the oral order was ambiguous.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 21

staleness of that information has caused the following problems:

- ◆ Detective Eddie Clark, the chief investigator of the Linda Jo Edwards murder does not remember whether he ever interviewed the managers of the apartment complexes regarding the visits by Louella Mayfield

- ◆ Captain Kenneth Findley, Tyler Police Department has no recollection of any  contact by apartment complexes advising that a young white girl was going to complexes around the City under the pretext of investigating a homicide involving Jim Mayfield and Linda Jo Edwards

- ◆ Captain Kenneth Findley has no recollection as to whether he even interviewed Louella Mayfield for impersonating a police officer

- ◆ then Sergeant Gerald Hayden generally recalls allegations relating to Louellas Mayfield but he does not recall whether any police representative actually interviewed any apartment managers

- ◆ Sergeant Gerald Hayden cannot recall whether he interviewed Louella Mayfield

- ◆ Sergeant Gerald Hayden cannot recall whether he took a statement from Louella Mayfield

- ◆ Sergeant Gerald Hayden doesn't recall whether he went to the Embarcadero apartments to follow up on the allegations

- ◆ Sergeant Gerald Hayden doesn't recall whether he ever discussed the allegations pertaining to Louella Mayfield with Detective Eddie Clark, the

lead investigator of the murder of Linda Jo Edwards[24]

The lack of recall between Mssrs. Findley and Hayden was so striking that the trial court stated: " It appears that Mr. Hayden doesn't know a whole lot; slightly more than Mr. Findley but just one grain would be a little more than Mr. Findley remembered..."

But even more daunting is the testimony of Louella Mayfield herself. She has absolutely no recollection of every donning her police like uniform and going to various apartment complexes looking for Jim Mayfield and Linda Jo Edwards. Further, she does not even remember ever putting on her uniform and going to the Embarcadero apartments purporting to investigate a murder of Linda Jo Edwards and Jim Mayfield.

The record is glaringly clear that individuals who, at one time, possessed the most information about Louella Mayfield's threats to Linda Jo Edwards and impersonation of a police officer now remember little to nothing. In the words of Judge Tunnell, it is a "grain", a grain that cannot be sown into anything more because the Smith County District Attorney's Office withheld that information from Petitioner's counsel for over fourteen years, thereby again denying Petitioner the ability to present witnesses and benefitting from its misconduct.

### PROSECUTION FAILED TO DISCLOSE EVIDENCE THAT PETITIONER AND DECEASED KNEW EACH OTHER

Throughout the course of this prosecution, the State has argued that this was a "stranger on stranger" crime. It has elicited testimony from law enforcement personnel as

---

24

Excerpts of Hearing on Habeas Corpus and Trial Transcript, 1994, attached hereto as Exhibit 17.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 23

to the interpretation of the crime scene and the distinctions between domestic homicide and lust murder.  However, at the very time that it was putting this theory before the juries, the State had in its possession, evidence that the petitioner and decedent knew each other.

The Court of Criminal Appeals cited this as yet another instance of  prosecutorial misconduct, namely the State's failure to disclose evidence in its possession that Petitioner and the victim knew each other.

> Rodney Dykes and his brother were available and testified at appellant's third trial, providing appellant an opportunity to correct the State's suppression of statements the Dykes brothers made which were exculpatory with respect to appellant.   This potentially exculpatory evidence included grand jury testimony by Rodney Dykes that [Petitioner] told him he met [the deceased] at the pool three or four days prior to her murder and then went to her apartment, where he received 'passion marks on his neck'.

The Court of Criminal Appeals opined that "Rodney Dykes and his brother were available and testified at appellant's third trial, providing appellant an opportunity to correct the State's suppression of statements the Dykes brothers made which were exculpatory with respect to [Petitioner]."   The Court of Criminal Appeals, however, overvalued the "opportunity" allowed Petitioner.

The availability of Rodney Dykes and his brother at the trial to "correct" the State's suppression of statements presumes that Petitioner will be allowed to inquire as to those exculpatory statements.  In the 1994 trial, the court denied Petitioner's request to inquire as to  information that Rodney and Randy Dykes had regarding those statements.[25]

---

25

1994 Trial Transcript, pps. 1762-1764; 1793-1805 attached hereto as Exhibit 18.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 24

The clear message from the Court of Criminal Appeals is that it expected Petitioner to have the opportunity at a retrial to use the suppressed information as if it had been originally disclosed.   Yet by virtue of the trial court rulings, the Petitioner remains in essentially the same position as when the information was unknown.

> **DURING THE FIRST TRIAL, PROSECUTION MISREPRESENTED THAT THERE WAS NO DEAL WITH ARRESTEE FOR TESTIMONY AS TO A PURPORTED JAILHOUSE CONFESSION**

In its opinion, the Court of Appeals cited as an incident of prosecutorial misconduct the failure of the prosecution in the 1978 trial to disclose that there had been a tacit understanding as to leniency.  The prosecution strenuously argued that the testimony of Shyster Jackson that Petitioner confessed was not influenced by any agreement because they "don't make deals with killers".  However, Judge Tunnell in the 1992 Findings of Fact and Conclusions of Law found that there was a tacit understanding of leniency for Jackson's testimony in the 1978 trial and that prosecutors failed to disclose that agreement.

While it may well be argued that the taint of the Shyster Jackson testimony is removed because he is no longer called as a witness by the State, that prosecutorial misconduct continues to benefit the prosecution.  It cannot be denied that this testimony was critical for the 1978 conviction.  It was a major causal link in the 1978 conviction.[26]

And with the 1978 conviction, obtained through reprehensible prosecutorial

---

[26]

The Shyster Jackson testimony along with the false testimony regarding the age of the fingerprints would undoubtedly tip any scale in favor of conviction of the Petitioner.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 25

misconduct, any subsequent statements made by the Petitioner assume evidentiary significance.  Because of that manipulated verdict of guilty, the State is now able to utilize post-conviction statements by the Petitioner as evidence in its case in chief.  Statements that the prosecution would never have had available to it if the State had not engaged in misconduct in the first place.

Thus, the impact of the Shyster Jackson testimony and the other misconduct occurring in the first trial continues to infect the subsequent trials to the State's benefit. The State's use of any comments or statements by the Petitioner which are necessarily reactive to that misconduct is a derivative use of their wrongdoing.  The taint cannot be removed as long as the Petitioner's reaction to that wrongdoing  are utilized affirmatively against Petitioner.

## THE PASSAGE OF TIME IN CONJUNCTION WITH THE PROSECUTORIAL MISCONDUCT RENDERS A FOURTH TRIAL FUNDAMENTALLY UNFAIR

Courts have long recognized the harmful impact that passage of time can have upon the ability of an individual to defend against charges of criminal wrongdoing.  Delay can often cause substantial prejudice to a defendant and provide the prosecution with a tactical advantage.  Such is clearly the case in this proceeding.

### Impact on Witness Appearances

The passage of time from the underlying offense until now affects witness appearances  in significant ways.  First, as the transcript excerpts pertaining to Louella Mayfield reflect, the witnesses have forgotten much of the information that they either had,

or may have had, over twenty-one  years ago.  Secondly, any investigative leads that might have been available to Petitioner have long vanished.  Thirdly, witnesses frequently become more set in their testimony, having given a certain description so many times that it is their testimony that they remember rather than the actual event.  And finally, witnesses are not immune from outside influences such as media reports, community attitudes, and a "circus-like atmosphere".  There is no meaningful way to undo these harms, no cross-examination can be an effective remedy,  no order that can be entered by a Court to correct the damage.

Impairment of Cross-Examination

Critical areas of cross-examination are rendered ineffective because individuals can claim with facial validity that they do not remember events as well years later and thereby avoid otherwise fruitful areas of impeachment.   Probing a witness' recollection is one of the focal points of cross-examination, however, when they have a readily available and acceptable explanation for their inability to remember, any such cross-examination must fall flat.

For example, in the 1994 trial, Jim Mayfield was directly questioned as to whether he recalled saying that the victim had "ruined him" or "caused him a lot of problems". Admission of such statements would be directly probative of a motive to murder his paramour.  However, Mayfield's  response that he did not have any recollection of those statements cannot be persuasively argued to constitute a denial which would have impeachment benefit.  Neither does it constitute an admission that could be argued to be inculpatory. And, given the time that has elapsed, it cannot be argued to be a means to

avoid the answer.  Thus, the effectiveness of Petitioner's cross-examination is directly impacted.

Similarly, the testimony of Mayfield's wife, Elfriede, which was first offered at the 1992 trial, cannot be meaningfully probed.  She professes not to remember the last time that she talked with Linda Jo Edwards; whether she saw her the night of the murder; whether Linda Jo Edwards came by their home the night of the murder; the time that Mayfield came home on the night of the murder; the time that Louella came home on the night of the murder; and whether Linda Jo Edwards would call their home.  The only fact that Mrs. Mayfield, by her own admission,  was able to recall was that "Jim and Louella were home and  that's the one thing that I have always remembered, through all of these years". [27]   An inability to recall anything but the critical fact would ordinarily  be an effective area of cross-examination but in this context it is severely weakened.

Petitioner is similarly impeded in his efforts to cross-examine Robert Wickham, a reserve deputy sheriff who testified in 1992, for the first time, that Petitioner had purportedly confessed the murder to him.  Wickham testified that in 1978, during an elevator ride as he was escorting Petitioner from the holding area to the courtroom, Petitioner admitted the crime.  Wickham further testified that he didn't remember whether there was anyone waiting outside the elevator when they got off.  He couldn't recall where Petitioner's attorneys met he and Petitioner.  He could not recall what happened when the

---

[27]

1994 Trial Transcript, p. 1359 ,attached hereto as Exhibit 19.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 28

attorneys finished their meeting with Petitioner.  He had no recollection as to the length of the elevator ride.   He did not remember what the Petitioner was wearing.  He couldn't remember who called him to report to duty on that day or when he received that telephone call.   He couldn't remember whether Petitioner was handcuffed in the front or the back. He couldn't  remember what assignment he had that afternoon.[28]  Examination as to other facts traditionally serves to measure the reliability of the testimony.  However, Wickham's inability to recall other facts and specifics is not as probative years after the alleged incident.

The same situation presented itself during the testimony of Glenn Miller, a witness called to testify as to a prior consistent statement by Wickham.  He didn't remember whether Wickham told him that he transported Petitioner during jury selection.  He couldn't remember whether he was present at a pre-trial proceeding where Wickham had earlier testified.  He didn't remember the date of the subject conversation with Wickham.[29]

As a corollary, certain evidence has been destroyed.  The diagram showing the location and number of wounds on the victim's body was either thrown out or destroyed because ten years had passed.[30]

Further, particularly with respect to police witnesses, the passage of the years

---

[28]

1994 Trial Transcript, pps. 1474-1480,  attached hereto as Exhibit 20.

[29]

1994 Trial Transcript, pps. 1511-1517,  attached hereto as Exhibit 21.

[30]

1994 Trial Transcript, pps. 2065-2066 attached hereto as Exhibit 22.

serves to create a greater sense of qualification and credibility.  Oftentimes, they have been promoted.  Almost always they have gained experience and training since their initial testimony.   In this case, Sergeant Collard has been promoted to Captain and now claims in excess of twenty years experience in the identification area.[31]

Impediment on Petitioner's Right to Testify

The passage of time adversely impacts Petitioner's ability to testify on his own behalf in several ways.  First, any inability to recall with specificity certain events, while acceptable for other witnesses, are subject to suspicion and skepticism when it is the defendant testifying.  It may well be that jurors would believe that they would remember every fact about something that so impacted their lives and therefore reject any lack of memory.

Further, any and all intervening conduct and statements can be used by the prosecution in cross-examination.  For example, Assistant District Attorney Dobbs has repeatedly urged the Court to allow evidence of Petitioner's suicide attempts and self-inflicted injuries while on death row as evidence of guilty conscience and/or an act of confession.  Even if Petitioner were fully allowed to describe the reasons and emotional despair leading to those acts, his anguish at being an innocent man framed and sent to death row, an assumption that cannot be made with certainty, he nonetheless is exposed

---

[31]

This message is repeated throughout the course of the trial as evidenced by the following question from the prosecutor: "In regard, Agent Hogan, to the items of evidence that you received from Sergeant—at the time Sergeant Doug Collard, now Captain Doug Collard of the Tyler Police Department identification Division... 1994 Trial Transcript, p. 594 attached hereto as Exhibit 23.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 30

to a State attempt to distort and twist those events.

Obviously, the fact that Petitioner has spent the last twenty-one years on death row significantly impacts his testimony. By virtue of that incarceration, he has been separated from individuals who might have otherwise been available as witnesses to corroborate testimony or rebut some of the State's accusations.

Finally, it is clear that if he testifies the jury will know that he has been previously convicted and sentenced to death. It is inevitable that questions will be raised regarding the prior trial; the basis upon which the jury found him guilty; and whether this new trial is the result of some "technicality". Because Petitioner is precluded from stating to the jury that his case was reversed due to prosecutorial misconduct and false and misleading testimony by law enforcement representatives, the jurors questions may well be resolved against him. If he is not allowed to explain, the jury may well draw the wrong conclusion, one which will inevitably inure to Petitioner's detriment.

### State's Ability to Bolster Case

With each trial, the State has introduced new evidence and advanced new theories, addressing the weaknesses that were established by the Petitioner. As a consequence, the State, through its successive prosecutions, has repeatedly "plugged holes". For example, throughout the 1978 and 1992 trials, the State vigorously argued that the Petitioner put a piece of the victim's lip, vagina, and hair in a knee-high stocking and took them as souvenirs. However, the 1992 jury discovered that knee-high stocking in the victim's pant leg, which pants had been in the custody of the State since the murder.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 31

Consequently, the State has had to abandon its claim that Petitioner used the stocking to remove body parts as souvenir, however, Petitioner is not allowed to point out the shoddy investigation which overlooked the stocking.

Similarly, the State's only identification witness, Paula Rudolph, the day she discovered the victim, she  described the individual that she had seen in the apartment as having silver hair, in a medium cut, touching the ears type fashion.  The Petitioner had long, coarse dark brown hair.[32]  By the time of her testimony in 1992, Ms. Rudolph explained the difference between her description of the individual's hair and Petitioner by saying that the "bright light" created a "halo effect" and made the hair look silver or gray. There have been similar changes and adjustments to the State's case through the years as illustrated by the chart below:

---

[32]

Ironically, another consequence of the passage of time is that Petitioner's hair is now gray and resembles much more closely the original description given by Ms. Rudolph.  Thus, for a juror looking at Petitioner today, there is not the marked difference between his physical appearance and her description as there was in 1978.

PETITION FOR WRIT OF HABEAS CORPUS,
Page 32

| STATE'S WITNESSES IN 1978, 1992, AND 1994 | | | | |
|---|---|---|---|---|
| No. | Witness Name | 1978 | 1992 | 1994 |
| 1 | Paula Rudolph | identified Cook | -explained difference between Cook's appearance & her description by "halo effect of bright lighting" -encountered Cook in elevator; knew it was him | same as 92 |
| 2 | Edward Shyster Jackson | Cook confessed | not used | not used |
| 3 | Doug Collard | fingerprints are 6 - 12 hours old | fingerprints are "fresh" | fingerprints are "fresh" |
| 4 | Randy Dykes | Cook peeped into victim's window | -Cook saw woman nude | same |
| 5 | Rodney Dykes | Cook saw victim nude in her window | -Cook asked him to approach woman (inference that it is the victim) at pool; she rejected Cook | same |
| 6 | Robert Hoehn | Cook's activities on night of murder; sexual activity | deceased; testimony read | deceased; testimony read |
| 7 | V.V. Gonzalez | pathologist; body parts are missing | same | same |
| 8 | James Taylor | | Cook said he didn't know victim | same |

| No. | Witness Name | 1978 | 1992 | 1994 |
|-----|--------------|------|------|------|
| 9 | William Watling | | digital enhancement of fingerprints; crime scene examiner may deem them to be "fresh" | same |
| 10 | Dusty Heskew | | crime scene reconstructionist; lust murder | same |
| 11 | Danny Carter | | fingerprint | same |
| 12 | Robert Wickham | | Cook confessed to murder in 1978 elevator ride | same |
| 13 | Glenn Miller | | Wickham told him about Cook confession | same |
| 14 | James Mayfield | | relationship with victim | same |
| 15 | Louella Mayfield Raitano | | father's alibi | same |
| 16 | Elfriede Mayfield | | husband's alibi | same |
| 17 | Alan Weckerling | | lighting expert to explain "halo effect" in Paula Rudolph's testimony | same |
| 18 | Joe Hogan | | toxicologist | same |
| 19 | Eddie Clark | | case investigator | same |
| 20 | Nita Wilson | | reporter, Cook's statement in 1988 | same |
| 21 | David Hanners | | reporter, Cook's statement in 1988 | same |
| 22 | David Barron | | reporter, Cook's statement on June 29, 1978 after being convicted | same |
| 23 | Tommy Wilbanks | | Cook's sexual activity/ sexual ambivalence | same |

| No. | Witness Name | 1978 | 1992 | 1994 |
|-----|-------------|------|------|------|
| 24 | Richard Petty | | | pathologist; body parts missing |
| 25 | Nelson Downing | | | Rudolph's condition at time statement taken |
| 26 | David Gomez | | | psychological profile |
| 27 | J.B. Smith | | | Smith County sheriff, re: Robert Wickham |

Petitioner can only speculate as to the further modifications that the State will make to its case.  The State did announce at a recent pre-trial hearing that it was going to present another expert as to "criminal profiling".[33]

## II. LEGAL PRINCIPLES WARRANTING THIS COURT'S INTERVENTION IN THIS PROCEEDING

While federal courts are to abstain from interference with a pending state criminal prosecution, the *Younger* abstention doctrine does not apply to double jeopardy claims. *Showery v. Samaniego,* 814 F.2d 200, 201 n.5 (5th Cir. 1987)   A federal injunction may be appropriate to stop a state criminal prosecution when there is a showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief.

This case presents the most unusual combination of circumstances that distinguish it from the ordinary case and cry out for federal intervention.  It is clear that the very

---

[33]

Petitioner has pending before the Court a Kelly/Daubert challenge to the use of "criminal profiling" testimony.

essence of double jeopardy protection, namely the freedom from successive prosecution, warrants this Court's action and a ruling that the prosecutorial misconduct which has infected this case and which continues to contaminate these proceedings provides a basis for relief. It is a deeply ingrained tenet, that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty. *Everett D. Green v. United States of America,* 355 U.S. 184, 187, 78 S.Ct. 221 (1957)

That principle, pronounced by the Supreme Court, has special meaning in the context of this case. Petitioner was on death row for almost twenty years before his release on bond. Repeat prosecutions suggest a "if at first you don't succeed, try, try again" mentality. The State should not be permitted to repeatedly re-try Petitioner. If the State had not engaged in misconduct during the first trial, Petitioner may not have even been convicted.

The opinion of Justice Baird in *Cook v. State* is most instructive in this regard. Recognizing the unique constitutional role of the prosecutor, Justice Baird reviews the "duty to investigate and prosecute criminal charges with fairness". "...[T]he principle of due process in general and requires fundamental fairness by the State in all of its dealings with those accused of crimes." (Citations omitted)

> In the instant case, the State's misconduct has ripened with the passage of years into a situation where the State cannot demonstrate

that a fair trial, free of the taint of its misconduct, will ever be possible. Under these circumstances appellant's retrial serves no purpose but to subject him to continuing mental, emotional and financial hardships. Retrial under these circumstances would violate the most fundamental and compelling notions of fundamental fairness essential the rule of law embodied in both the Texas Constitution and the United States Constitution. Having irreparably crippled appellant's ability to defend himself, and its own ability to uncover the truth, I do not believe the State should be permitted to abuse its power by again forcing appellant to defend himself against these accusations. Such abuse of State power is precisely what our federal and state constitutional rule of law, in general, and due process and due course of law, in particular, were intended to prohibit.

Justice Baird's words point out, not only the harm suffered by Petitioner, but the mandates of constitutional protections. Petitioner is entitled to have those protections shield him from this impending fourth prosecution.

## CONCLUSION

Petitioner's ability to have a fundamentally fair trial has been so impacted by prosecutorial misconduct, the passage of time, restrictive evidentiary rulings, and the death of a witness that to subject him to a fourth trial is to demean the ideals of due process and his constitutional protections. Intervention is warranted and the fourth trial of Petitioner should be prohibited.

WHEREFORE, it is respectfully requested that Petitioner be granted a hearing on this Petition and the impending trial be stayed pending final ruling.

Respectfully submitted,

Steven R. Rosen
The Lyric Centre
440 Louisiana, Suite 2100
Houston, Texas 77002
Phone: (713) 227-2900
Facsimile: (713) 227-2922
State Bar No. 17266200

Cheryl B. Wattley
Wattley & Plumlee, LLP
4311 Oak Lawn Avenue
Suite 555, LB 23
Dallas, Texas 75219-2310
Phone: (214) 443-9300
Facsimile:  (214) 443-0600
State Bar No.: 20978100

## VERIFICATION

Pursuant to 28 U.S.C. § 2242, I, Cheryl B. Wattley, on behalf of Kerry Max Cook , do hereby state under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Cheryl B. Wattley

PETITION FOR WRIT OF HABEAS CORPUS,
Page 38