EOD JAN 29 '99

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JAN 29 1999

DAVID J. MALAND, CLERK
BY
DEPUTY

| | | |
|---|---|---|
| KERRY MAX COOK | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 6:99cv15 |
| | § | |
| ROBERT JONES, JUDGE, | § | |
| 241ST JUDICIAL DISTRICT COURT, | § | |
| J.B. SMITH, SHERIFF OF SMITH | § | |
| COUNTY, AND THE STATE OF TEXAS | § | |

<u>MEMORANDUM OPINION
AND ORDER OF DISMISSAL</u>

Petitioner Kerry Max Cook brings this petition for writ of habeas corpus pursuant to 28

U.S.C. § 2241.[1]  The Petitioner is bringing this action in an attempt to prevent his retrial for the

capital murder of Linda Jo Edwards.

<u>Factual and Procedural History</u>

The facts of the case and the legal issues that are being brought in the petition were

thoroughly developed by the Texas Court of Criminal Appeals when it reversed the Petitioner's

previous conviction and remanded it for retrial.  *Cook v. State*, 940 S.W.2d 623 (Tex. Crim. App.

1996).   The Texas Court of Criminal Appeals concluded that "[p]rosecutorial and police

misconduct has tainted this entire matter from the outset" and thus has violated the Due Process

---

[1]This action challenges a proceeding which has not resulted in a conviction.  Thus, the action
is properly considered under the standards of 28 U.S.C. § 2241.  *See Braden v. 30th Judicial Circuit
Court of Kentucky*, 410 U.S. 484 (1973); *Stringer v. Williams*, 161 F.3d 259 (5th Cir. 1998).

1



Clause of the Fourteenth Amendment to the United States Constitution and the Due Course of Law provisions found in the Texas Constitution. *Id.* at 627. It is noted that the Texas Court of Criminal Appeals also concluded that police and prosecutorial misconduct, coupled with the passage of time, did not preclude retrial, although it would complicate the construction of a defense. *Id.* at 628. The Petitioner is presently arguing that a retrial should actually be barred and that the State of Texas should not be given yet another chance to convict him.

The facts of the case that will be presented in this opinion are based on the facts as discussed by the Texas Court of Criminal Appeals. The Petitioner was initially indicted for this offense, a capital murder alleged to have been committed in Smith County in 1977, in 1978. He was convicted and was sentenced to death. The Texas Court of Criminal Appeals affirmed the conviction and death sentence in 1987. *Cook v. State*, 741 S.W.2d 928 (Tex. Crim. App.1987). The Supreme Court vacated the decision and remanded the case back to the Texas Court of Criminal Appeals. *Cook v. Texas*, 488 U.S. 807 (1988). The Texas Court of Criminal Appeals subsequently reversed the judgment and remanded the cause to the trial court. *Cook v. State*, 821 S.W.2d 600 (Tex. Crim. App.1991). In 1992, the Petitioner's first retrial ended in a mistrial after the jury was unable to reach a verdict. In 1994, the Petitioner was tried a third time, which resulted in the Petitioner's conviction. He was again sentenced to death. On an automatic appeal, the Texas Court of Criminal Appeals reversed and remanded the case. *Cook v. State*, 940 S.W.2d 623 (1996). At this juncture, the case is scheduled for retrial in Bastrop, Texas, and is to commence on February 8, 1999.

The facts of the offense as described by the Texas Court of Criminal Appeals reveal that the complainant, Linda Jo Edwards, was involved in an affair with James Mayfield, a married

2

man, for the eighteen month period prior to her murder.  About three weeks before her death, Mayfield left his wife and moved into an apartment with the complainant.  During its investigation of the crime, the Smith County District Attorney's office found that Mayfield's sixteen-year-old daughter, Louella, had made repeated death threats against the complainant to third parties as well as one directly to the complainant just a few days before the murder.

Mayfield ended the affair and moved back to his wife's house in May of 1977.  The complainant subsequently tried to kill herself but, after being found unconscious by Mayfield and brought by him to the hospital, recovered.  After her recovery, she moved into an apartment with Paula Rudolph, at the same complex where she had previously lived with Mayfield.  Mayfield's affair with the complainant became public after her suicide attempt and contributed to the loss of his position as Dean of Learning Resources at Texas Eastern University in late May of 1977.

In early June of 1977, the Petitioner, who lived in Dallas, moved into an apartment with James Taylor.  The apartment was in the same complex as the complainant's.  At trial, Rodney and Randy Dykes, Taylor's nephews, testified that the Petitioner told them he had watched a woman undress through the window of an apartment while returning from the pool.  The following day, the Petitioner sent Rodney over to two females at the pool, one of whom matched the complainant's description, to tell them that the Petitioner was interested in them.  Rodney testified they expressed no interest in the Petitioner.  The Petitioner and Rodney then left the pool, returned to the apartment and ate supper.  The Petitioner left after dark.

The Petitioner returned later that night.  Rodney testified he gave the Petitioner a back rub and noticed "hickeys" on his neck, which he had not observed earlier.  On June 9, the Petitioner and Robert Hoehn, who arrived at Taylor's apartment at about 10:30 p.m., watched a cable

3

movie, *The Sailor Who Fell from Grace with the Sea*, which involved a mutilation of a cat and an insinuation of a genital mutilation of a seaman by a group of children.  During the movie, the Petitioner and Hoehn went to the pool for awhile.  On their way to the pool, the Petitioner showed the complainant's window to Hoehn and told him an attractive woman lived there.  They returned and watched the rest of the movie.  During the mutilation scene, the Petitioner masturbated. Hoehn testified they left for the store to get cigarettes at about midnight and returned about 12:30 a.m.  Hoehn dropped the Petitioner off at the entrance to the apartment complex instead of dropping him off directly at Taylor's apartment, and drove away.

Until about 10:30 p.m. on June 9th, the complainant was at an apartment of some friends. She informed her friends she had to return to her apartment because her roommate, Rudolph, was leaving about 10:30 p.m. and she needed to get home before she left.  Rudolph testified she returned to the apartment shortly after 12:30 a.m.  She saw a man through the open door to the complainant's bedroom and assumed it was the complainant's boyfriend, Mayfield.  She testified she told him, in effect, "it was her and don't worry about it."  Although he did not look like Mayfield, it was dark and she decided it must have been him and went to her room after the man closed the door to the complainant's room.

When Rudolph got up the next morning, she discovered the complainant's body. The autopsy disclosed she had been struck in the head with a statue, stabbed numerous times and severely mutilated, most notably in the genital area.  Fingerprints subsequently identified as the Petitioner's were found on the sliding glass door to the patio of complainant's apartment.  The Petitioner was subsequently arrested and indicted for the capital murder of complainant.

4

In his appeal to the Texas Court of Criminal Appeals, the Petitioner alleged that the Smith County District Attorney's Office engaged in egregious prosecutorial misconduct during the period of time commencing with the murder investigation and including the Petitioner's first two trials. The Texas Court of Criminal Appeals noted that the appeal presented an issue of first impression, namely, whether prosecutorial misconduct, magnified by the passage of over fourteen years and the death of a key witness, can so degrade the normal workings of justice that a fair trial becomes impossible and thus retrial is forbidden under due process and due course of law principles.  The Texas Court of Criminal Appeals listed the following numerous ways that the State allegedly engaged in misconduct.

During its investigation of the crime, the Smith County District Attorney's Office found that Mayfield's sixteen-year-old daughter, Louella, had made repeated death threats against complainant to third parties as well as one directly to complainant just a few days before the murder.  The investigation also revealed Louella falsely identified herself as an investigator with the Tyler Police Department to the manager of the apartment complex where complainant lived and told the manager that she was investigating a homicide involving Jim Mayfield and a Linda Jo Edwards (this conversation took place two weeks before Edwards' murder.)  The district attorney did not reveal this information to the Petitioner until 1991, fourteen years after the murder.  Additionally, a report drafted by a Tyler Police Department sergeant, in which he states he "personally knows Louella to be mentally and emotionally unstable, very hyperactive and a pathological liar," was not revealed to the Petitioner until 1991.  The only two witnesses who supported James Mayfield's alibi that he was asleep at his wife's house at the time complainant was murdered were his wife and Louella.  The Texas Court of Criminal Appeals noted that the

5

failure to provide the Petitioner with the potentially exculpatory information concerning Louella Mayfield was prosecutorial misconduct violative of *Brady v. Maryland*, 373 U.S. 83 (1963).  *Id.* at 626.

The Texas Court of Criminal Appeals next noted that the Smith County District Attorney's Office misrepresented during the Petitioner's first trial a deal made by the prosecutor with Edward "Shyster" Jackson, who was in custody awaiting trial on a murder charge.  *Id.*  In exchange for having the pending murder charge reduced to involuntary manslaughter with a two-year sentence, including credit for time served, Jackson testified that the Petitioner made a jailhouse confession that he killed the complainant.  The State implied during closing argument it had made no deal with Jackson in order to procure his testimony.  After he was released, Jackson admitted his trial testimony was a total fabrication.  This information was not provided to the Petitioner until 1991.

The district attorney's office also engaged in misconduct by failing to reveal to the Petitioner that it possessed evidence that the Petitioner and complainant knew each other.  *Id.* Despite having this evidence, the State presented, at the Petitioner's first trial, its theory that the Petitioner and the complainant were total strangers and he had not been to her apartment until the evening of her murder.  This potentially exculpatory evidence not revealed to the Petitioner included grand jury testimony by Rodney Dykes that the Petitioner told him he met complainant at the pool three or four days prior to her murder and then went to her apartment, where he received "passion marks on his neck."  The State did not provide this "highly exculpatory" testimony to the Petitioner until years after the Petitioner's first trial.

The State also failed to reveal to the Petitioner, at his first trial, a prior inconsistent statement by a key prosecution witness, Robert Hoehn. *Id.* Hoehn testified at the Petitioner's first trial he had homosexual sex with the Petitioner shortly before the murder and that the Petitioner had watched, and became aroused by, a movie, *The Sailor Who Fell from Grace with the Sea*, that evening. This highly prejudicial testimony was directly contradicted by Hoehn's earlier sworn testimony before the grand jury in which, while admitting he was a homosexual, he said he had not had sex with the Petitioner. He also testified that the Petitioner paid no attention to the movie. The State did not disclose Hoehn's grand jury testimony to the Petitioner until after commencement of the Petitioner's second trial and after Hoehn's death. Hoehn's death also made it impossible for the Petitioner to impeach Hoehn's testimony with a prior statement he made to the district attorney's office that he had not had sex with the Petitioner.

The State also introduced misleading testimony at the Petitioner's first trial as to the age of fingerprints found to be those of the Petitioner and found at complainant's apartment. *Id.* The State's witness testified they were six to twelve hours old, which placed the Petitioner at the scene at the time the murder was committed. However, the witness, Sgt. Collard, admitted, in writing and in response to a grievance filed against him in 1978, his "expert opinion" regarding the age of the fingerprints was not in fact an expert opinion, was a mistake which could not be supported by any scientific evidence or by any other latent fingerprint expert, and that the district attorney had pressured Collard to present the false and misleading evidence against Collard's wishes. Collard's written statement was not disclosed to the Petitioner until 1992.

The Texas Court of Criminal Appeals finally noted that the Smith County District Attorney's Office engaged in misconduct when an assistant district attorney attempted to interview

7

the Petitioner without the presence of the Petitioner's attorney and without the knowledge of the

Petitioner's attorney prior to the Petitioner's second trial. *Id.*

In reversing the conviction, the Texas Court of Criminal made the following conclusions:

> Prosecutorial and police misconduct has tainted this entire matter from the outset. Little confidence can be placed in the outcome of appellant's first two trials as a result, and the taint, it seems clear, persisted until the revelation of the State's misconduct in 1992.

> Much of the earlier misconduct by the State was cured prior to appellant's third trial. The misconduct with respect to Edward "Shyster" Jackson's testimony was not relevant as Jackson did not testify at the third trial. The State's misconduct with respect to Collard's testimony was corrected by full disclosure prior to appellant's third trial. Rodney Dykes and his brother were available and testified at appellant's third trial, providing appellant an opportunity to correct the State's suppression of statements the Dykes brothers made which were exculpatory with respect to appellant.

> The death of Robert Hoehn, however, precluded appellant from investigating the contradictions between his testimony at trial and before the grand jury, and between his trial testimony and his statement to the police. Hoehn's testimony was crucial as it placed appellant near the scene of the murder in an aroused emotional state at the time of its commission. Hoehn's trial testimony also contradicted his statement to the police concerning whether appellant watched a movie on television which, the State averred at trial, inflamed appellant just prior to the time the murder was committed. Use of Hoehn's testimony at appellant's third trial, under these circumstances, casts serious doubts as to the fairness of appellant's third trial and the reliability of the proceeding against him. Accordingly, reversal of appellant's conviction is mandated by the Due Process Clause of the United States Constitution as well as the Due Course of Law provision of the Texas Constitution.

> We do find that, consistent with constitutional principles, a retrial of appellant is possible, assuming, of course, the State elects to retry him. However, we are convinced that Hoehn's unavailability for any retrial, given the Supreme Court's holdings in Brady, Moore, Kyles and Bagley, would bar use of his testimony from appellant's prior trials or any statements he may have given concerning this case at any such retrial. Clearly, any testimony or statements of Hoehn are tainted by the State's prior misconduct, which cannot now be corrected by cross-examination or other means and fundamental fairness and due process forbid their use at any retrial of appellant.

> With respect to Louella Mayfield, we recognize the passage of time, coupled with the State's earlier suppression of evidence which strongly suggested she was a viable suspect in the murder, has complicated appellant's opportunity to investigate and develop

a potential defense based on her as a viable suspect. See Ex parte Mitchell, 853 S.W.2d 1 (Tex. Crim. App. 1993). The record, however, does not state Louella is unavailable.

If appellant is retried, he will be free to call Louella as a witness and will have available, at the very least, the Tyler Police report labeling her as a pathological liar, as well as the results of the investigation placing Louella at the complainant's apartment complex at or near the time of the murder and describing threats she made against complainant. While the combination of the passage of many years plus State misconduct may well complicate appellant's construction of a defense based on Louella's being a viable suspect, the record does not support appellant's contention that it is not, at this late date, possible to do so.

*Id*. at 627-28.

<u>The Petitioner's Arguments</u>

The Petitioner cites all of the examples of State misconduct as found by the Texas Court of Criminal Appeals in arguing that a retrial should be barred. He alleges that when such negative consequences are considered in conjunction with evidentiary rulings that have governed the conduct of the second and third trials, it is clear that the remedial measures anticipated by the Texas Court of Criminal Appeals will be denied to him and that he will be denied a fair trial and due course of law.

The Petitioner notes that courts have long recognized the harmful impact that passage of time can have upon the ability of an individual to defend against charges of criminal wrongdoing. Delay can often cause substantial prejudice to a defendant and provide the prosecution with a tactical advantage. He goes on to catalog how he is now disadvantaged. The witnesses have forgotten much of the details of the case over time. Cross-examination will be impaired because witnesses will be unable to recollect facts. The Petitioner states that his own ability to testify is impaired. He notes that the prosecutor repeatedly urged the trial court during the third trial to allow evidence that he mutilated himself and attempted suicide while on death row as evidence of

9

guilt.  He notes that even if he were fully allowed to describe the despair leading to those acts, his anguish as being an innocent man framed and sent to death row, an assumption that cannot be made with certainty, he, nonetheless, is exposed by the State's attempt to distort and twist those events.  Finally, if he testifies, the jury will know that he was previously convicted and sentenced to death.  The jury will inevitably wonder if his conviction was reversed based on a mere "technicality."

The Petitioner notes that the State has introduced and advanced new theories during each trial, addressing the weaknesses that were previously established by him.  Thus they have been able to "plug holes."  He notes the example of the State's argument in 1978 and 1992 that the Petitioner put a piece of the victim's lip, vagina, and hair in a knee-high stocking and took them as souvenirs.  However, in 1992, the jury discovered the knee-high stocking in the victim's pant leg, which pants had been in the custody of the State since the murder.  The State abandoned the claim during the third trial.  It was also noted that Paula Rudolph changed her testimony about the description of the person she had seen at the apartment at the night of the murder and explained away her change in story by saying that a bright light created a "halo effect."  The Petitioner presents a chart listing the various state witnesses from the three trials and notes who were added and dropped over time and how their testimony has changed over time.  The Petitioner finally notes that he can only speculate as to the new modifications that will be employed at another trial.

<u>Responses</u>

The State of Texas notes that the issue in this case concerns whether a retrial is barred by double jeopardy.  Double jeopardy does not bar a retrial once a conviction has been reversed by

an appellate court.  *Ball v. United States*, 163 U.S. 662, 672 (1896).  The State notes that a retrial will be barred only in two instances.  The first concerns a reversal based on insufficient evidence, which acts as a jury verdict of acquittal.  *Burks v. United States*, 437 U.S. 1, 16-18 (1982).  The second one concerns the situation where prosecutorial misconduct was intended to goad the defendant into seeking a mistrial.  *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982); *Robinson v. Wade*, 686 F.2d 298 (5th Cir. 1982).  The State argues that the Petitioner has not shown that a retrial is barred by double jeopardy.  The State notes that the Petitioner complains that the prosecution is based on a vindictive "try, try again" attitude, but the Petitioner has not shown that the prosecution is being conducted without hope of obtaining a conviction.  *Perez v. Ledesma*, 401 U.S. 82, 85 (1971).

The State argues that the Petitioner has not shown that the ruling by the Texas Court of Criminal Appeals was against the clear precedent of the Supreme Court, an unreasonable application of precedent or unreasonable in light of the facts in evidence.  In making the argument, the State is employing legal concepts associated with 28 U.S.C. § 2254.  The Petitioner asserts that jurisdiction is based on both § 2241 and § 2254; however, the present petition is a pretrial petition for a writ of habeas corups that is governed by § 2241.  *See Dickerson v. State of Louisiana*, 816 F.2d 220, 224 (5th Cir. 1987).  The standards that must be employed are those associated with § 2241 proceedings.

In his response, Sheriff J. B. Smith questions whether he should be a respondent since he does not have custody over the Petitioner.  He argues that the Petitioner has not alleged custodial allegations as required by § 2254.  He argues that entertaining the petition would violate the doctrine of federal court restraint as enunciated in *Younger v. Harris, supra*.  He notes that an

11

exception to the *Younger* doctrine occurs when a petitioner is able to show bad faith or harassment on the part of state prosecuting authorities. *Shaw v. Garrison*, 467 F.2d 113 (5th Cir. 1972); *Wilson v. Thompson*, 593 F.2d 1379 (5th Cir. 1979). Sheriff Smith notes that *Wilson* requires the following: (1) "the conduct allegedly retaliated against or sought to be deterred was constitutionally protected;" and (2) "the criminal prosecution was motivated at least in part by a purpose to retaliate for or deter that conduct." The relevant factors to be considered in this determination are "whether the State prosecution was undertaken with no hope of a valid conviction and the significance of the alleged criminal activity." Sheriff Smith argues that the Petitioner has not alleged facts which satisfy this standard. Sheriff Smith finally argues that the petitioner has not alleged or demonstrated that he has exhausted his state remedies as required by § 2254.

In his response, Judge Jones likewise focuses on principles found in § 2254, as opposed to § 2241. He argues that he does not have custody of the Petitioner, as required by § 2254. He argues that the Petitioner has not exhausted his administrative remedies as found in § 2254. He also argues that entertaining this petition would violated the doctrine of federal restraint as enunciated in *Younger v. Harris*, *supra*.

<u>Discussion and Analysis</u>

This Court will again note that jurisdiction of this action is proper under 28 U.S.C. § 2241(c). *Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 300 (1984). The principles that must be employed in this case are those associated with § 2241. *Dickerson v. State of Louisiana*, 816 F.2d at 224. By contrast, § 2254 proceedings involve post-trial situations. *Id.*

Sheriff Smith and Judge Jones challenge whether they are properly included as respondents. In cases where a defendant has been released on bail, the person who has potential custody over the defendant, such as a sheriff, and the court that released the defendant on bail and can revoke it are proper respondents. *Reimnitz v. State's Attorney of Cook County*, 761 F.2d 405, 408-09 (7th Cir. 1985). Smith and Jones were appropriately included as respondents.

The Respondents argue that the case should be dismissed for failure to exhaust. They cite § 2254 as authority, but, once again, the present lawsuit is a § 2241 proceeding. "It is only in the post-trial setting that exhaustion is mandated by statute. . . . Despite the absence of an exhaustion requirement in the statutory language of section 2241(c)(3), a body of case law has developed holding that although section 2241 establishes jurisdiction in the federal courts to consider pre-trial habeas petitions, federal courts should abstain from the exercise of that jurisdiction if the issues raised in the petition may be resolved either by trial on the merits in the state court or by other state procedures available to the petitioner." *Dickerson v. State of Louisiana*, 816 F.2d at 225. Federal habeas corpus relief "does not lie, absent 'special circumstances', to adjudicate the merits of an affirmative defense to a state criminal charge prior to the judgment of conviction by a state court." *Id.* at 226 (*citing Braden*, 410 U.S. at 489).

The issue before the Court is whether the Court should prevent the retrial of the Petitioner in state court. Federal courts, as a matter of comity, rarely ever enjoin state criminal proceedings because of the abstention doctrine established in *Younger v. Harris*, 401 U.S. 37 (1971). *See also Ballard v. Wilson*, 856 F.2d 1568, 1569-70 (5th Cir. 1988). On the other hand, the Petitioner correctly points out that while federal courts are to abstain from interference with a pending state criminal prosecution, the *Younger* abstention doctrine does not apply to double jeopardy claims.

13

*Showery v. Samaniego*, 814 F.2d 200, 201 n.5 (5th Cir. 1987).  *See also Stringer v. Williams*, 161 F.3d 259, 262 (5th Cir. 1998).  Relief will thus be available in this case, if at all, by the prohibition against double jeopardy.

The Court notes that the Double Jeopardy Clause does not contain a general double jeopardy prohibition from being retried once a conviction has been reversed by an appellate court. *Ball v. United States*, 163 U.S. 662, 672 (1896).  In cases such as the present case, the Supreme Court has set forth two instances in which a state cannot retry a criminal defendant once the original conviction has been reversed.  The first instance is when the conviction was reversed based on the sufficiency of the evidence.  In such instances, the reversal is equivalent, for double jeopardy purposes, to a jury verdict of acquittal.  *Burks v. United States*, 437 U.S. 1, 16-18 (1982).  The second instance, and the one that is more germane to the Petitioner, concerns a narrow exception in which retrial is barred if the original trial was infected with prosecutorial misconduct that was intended to goad the defendant into seeking a mistrial.  *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982).

The Petitioner's claim that a retrial should be barred is not novel in the federal courts, and such claims have generally been rejected by the courts that have considered it.[2]  In *Robinson v. Wade*, 686 F.2d 298 (5th Cir. 1982), the Fifth Circuit considered the issue and decided not to extend the rule of *Oregon v. Kennedy* beyond the parameters set forth by the Supreme Court.  The Fifth Circuit held that the Double Jeopardy Clause will bar reprosecution only if analysis of

---

[2]*Jacob v. Clark*, 52 F.3d 178 (8th Cir. 1995).  Most recently, this Court rejected such a challenge by a former death row inmate in *Mitchell v. Cynthia Stevens Kent*, Civil Action No. 6:98cv667.

14

objective facts and circumstances shows that the conduct in question was intended to provoke a motion for mistrial.  *Id.* at 309.

In his petition, the Petitioner did not address the standard announced in *Robinson v. Wade*. The Court will, nonetheless, examine the examples of state misconduct presented by the Petitioner to see if they provide any possible basis for relief under *Robinson v. Wade*.  It is noted that the examples of misconduct cited by the Petitioner essentially follow the examples of misconduct as found by the Texas Court of Criminal Appeals.  In Section VII of its answer, the State challenges these examples of misconduct; nonetheless, the examples of misconduct were found by the Texas Court of Criminal Appeals and it is too late for the State to challenge such findings at this time.

The Petitioner initially notes that the prosecution engaged in misconduct by failing to disclose information regarding Louella Mayfield.  The Petitioner, however, may introduce evidence about Louella Mayfield during the retrial.  This particular act of misconduct by the prosecution cannot be regarded as an attempt to provoke a motion for mistrial.  The Petitioner next notes that the Prosecution failed to disclose evidence that he and the deceased knew each other. Once again, the Petitioner may bring out this fact during a retrial, and this act of misconduct cannot be regarded as an attempt to provoke a motion for a mistrial.  The Petitioner next notes that the prosecution, during the first trial, misrepresented that there was no deal with Edward Jackson when Jackson testified as to a purported jailhouse confession.  If Edward Jackson testifies at the next trial, then the Petitioner will be able to address this matter.  The Petitioner finally asserts that the passage of time renders a fourth trial fundamentally unfair.  The problem with witnesses' ability to recall facts could be a problem, but such problems exist with respect to any trial where there has been a delay in time.  Nonetheless, the issue is whether the State's misconduct can be

15

regarded as an attempt to provoke a mistrial.  It cannot be inherently viewed as such with respect to witnesses having trouble recalling facts. The Petitioner complains that his right to testify is impaired by things that have happened to him over the last twenty years, particularly the fact that he was previously given the death penalty and his fear that a new jury may assume that his conviction was reversed because of a mere "technicality."  His attorney may address these problems at trial, but such problems once again cannot be regarded as an attempt by the prosecution to provoke a mistrial.  Finally, the Petitioner notes that the State has been able to bolster its case, improve its tactics and to plug holes with each passing trial.  Clearly both sides will benefit from knowing the opposing sides' case and accordingly will be able to polish their approach to the case at trial.  Overall, the Petitioner has not shown that the prosecution engaged in misconduct for the purpose of provoking a mistrial.  The Court is of the opinion, and so finds, that the Double Jeopardy Clause does not prohibit a retrial in the present case.

On page 25 of his petition, the Petitioner argues that a federal injunction may be appropriate to stop a state criminal reprosecution when there is a showing of bad faith, harassment, or any other unusual circumstances that would call for equitable relief.  He did not cite any case law to support the assertion, and he did not develop this argument.  The Court notes that the "bad faith" and "harassment" arguments were discussed by the Supreme Court in *Younger*.  401 U.S. at 50.  Sheriff Smith correctly noted that such arguments were employed in *Shaw v. Garrison* and *Wilson v. Thompson*.   He also noted that such arguments were employed in a case involving him in *Smith v. Hightower*, 693 F.2d 359 (5th Cir. 1982).  In *Wilson*, for example, the Fifth Circuit required a showing of the following: (1) the conduct allegedly retaliated against or sought to be deterred was constitutionally protected; and (2) the criminal prosecution

was motivated at least in part by a purpose to retaliate for or deter that conduct.  The relevant factors to be considered in this determination are whether the State prosecution was undertaken with no hope of a valid conviction and the significance of the alleged criminal activity.  In the present case, the Petitioner did not address these concepts.  He did not show that he was being prosecuted because he engaged in a constitutionally protected activity and that the prosecution has a retaliatory intent in prosecuting him.  He did not show that the State prosecution was being pursued for any reason other than to convict him.  Instead, he merely complains that the prosecution has repeatedly engaged in misconduct and should not be allowed to "try, try again."

The Petitioner also argues that a retrial should be prohibited pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  He did not, however, cite any federal case law showing that a generalized concept of due process provides another exception to the *Younger* abstention doctrine.  He likewise failed to cite any federal case law supporting a claim that a retrial should be prevented pursuant to the Due Process Clause.  Instead, he merely cites Justice Baird's concurring and dissenting opinion in his case to support his claim.  *Cook v. State*, 940 S.W.2d at 639.  This Court's review of the law has not uncovered any federal case law to support the Petitioner's argument.  On the other hand, there is case law showing that the Petitioner's concerns with respect to a retrial do not violate due process.  For example, in *Muniz v. Johnson*, 132 F.3d 214, 223-24 (5th Cir. 1998), the Fifth Circuit found that testimony during a retrial revealing to the jury that the defendant had previously been sentenced to death did not so infect the entire trial to violate due process.  Overall, the Petitioner has not shown, and this Court has not found, any case law supporting the proposition that a retrial may be barred by a generalized concept of denial of due process.

17

The Court notes that it is somewhat sympathetic to the Petitioner's situation in that he should not be forced to defend himself *ad infinitum* after the Smith County District Attorney's Office has repeatedly engaged in egregious acts of misconduct throughout the course of this matter.  Nonetheless, the Court does not have a constitutional basis to prevent the retrial.  The Double Jeopardy Clause has not been violated.  Having reviewed the petition, the facts of the case and applicable law, the Court is of the opinion, and so finds, that relief should be denied.  It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice.  It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

SIGNED this ___29th___ day of January, 1999.

JOHN HANNAH, JR.
UNITED STATES DISTRICT JUDGE

18